Please the court. My name is Michael Moore. I represent Denge Gahano, who is on appeal here from the Board of Immigration Appeals. And after argument was finished, the Supreme Court decided a case called Ramos v. Louisiana, which the court had especially brief. And that's because Mr. Gahano was convicted in the state of Oregon. The Ramos case originated in Louisiana. Now, only those two states, Louisiana and Oregon, allowed a conviction for a serious crime that is for one for more than six months as a possible confinement to be a jury, to have a jury that returned less than unanimous as all 12 finding the individual guilty. The Supreme Court decided in Ramos that the Sixth Amendment to the Constitution required that they all be all 12. And in this case, it is obvious from the record that Mr. Gahano did not get that. It's obvious from the charge from the judge to the jury on page 1727, the certified administrative record, where he told them that only 10 out of 12 was all that was necessary. It's also obvious from the verdict form on page 1736, the certified administrative record, that it's signed by the jury foreperson. The instructions at the top are that only 10 out of 12 need to find individual guilty. Counsel? Yes, ma'am. Is there any evidence in the record that the verdict was less than unanimous? What can we look in the record to determine if the actual verdict was less than unanimous? Yes, the verdict form is on page 1736, the certified administrative record. This particular offense has been charged as for menacing. And on that page, we have a checkmark here by the block menacing, the charge of menacing. And then we have at the very end of those documents, 1736 being one of them, that we have a seizure by the jury foreperson. And then the instructions at the very top, the beginning of all of those charges for which the jury returned various verdicts, we find the instructions by the judge that all they needed was to find 10 people who agreed with that decision. But that doesn't tell us that it was actually, actually less than unanimous, does it? But all we have to go by is the record, and that is the record, I believe, the charge by the judge and the verdict as returned by the jury and the instructions to them, 10 out of 12. So it seems to me that, Pranaficia, that's what we have. But it doesn't, the problem I'm having is that if there were, if there were an indication that the verdict was less than unanimous, if there was a 10-2 or something delineated on the verdict form, I would be more persuaded that there had been a violation, but for all we know, it was a unanimous verdict, right? That certainly was the case in Ramos, where we had two jurors say, we definitely disagree with the decision of the 10. So that's not the case here, but I think it goes down to who has the burden of proof in this case. And it seems to me here that what we have here on the record is what we have to accept is that there was only 10, and that's what we need to go by. Mr. Gajano did not have a unanimous verdict. So you say we have to accept it was only 10 because of what? Because that's the instruction that was given? Because that was the instruction that was given, it was also part of the constitution of the state of Oregon at the time. And now it is apparently no longer being as a jury instruction, but that was the jury instruction that was on their verdict form. So as soon as they arrived at the magic number of 10, their duty was over. They reported back to the court. But if there had been, if it had been unanimous and we knew it was unanimous, you would agree that that would be a different case? It would be yes or no, yes, absolutely. If we had all 12 of them sign there and say, yes, we did it, we certainly would have a different case, yes. It would not be a Ramos case. Well, this is not the Ramos case either, is it? No, there's a distinction here. Mr. Ramos is not facing deportation, he's facing life imprisonment. And we have the two jurors which told the court that we disagree. So there are some differences, obviously, between Ramos and this case. My point is, we go by the record that we have and the record indicates here that all we can see is that there's 10 out of 12. But does, so is that a requirement for, I mean, you mentioned that one of the differences is deportation. It seems to me that that's part of the part of the difference that may not, may hurt your client here because there isn't a requirement that it's unanimous for, there's no requirement that it's a unanimous verdict. There just has to be a, at least under Ninth Circuit law, a formal judgment of guilt. And so it seems to me that whether there's 10 votes or 11 votes or 12 votes, we know one of those three things took place. There's a formal judgment of guilt. And why isn't that enough under the Ninth Circuit case law to have a conviction sufficient under Ramos to warrant removal if it's otherwise warranted? I think that's a good question. And I believe that Ramos supersedes that in requiring unanimous verdict. If your decision of judgment is not enough any longer, you need to have, on the record, indicated that all 12 jurors acceded to this finding. Okay. Can I ask you about, do you, some of the other arguments here, categorically, do you believe, lay out your argument for why you think that this isn't a categorical match with federal law, Oregon Statute 163.190? It's because under the Oregon statute, words are enough in order to convict under the statute. Under the federal law, it's, you need to have some kind of force involved. My arguments are that force and words are not equivalent. For example, if I saw a train speeding at you and you're standing inadvertently upon the rails, I told you, wow, you're about to get hit, it's going to hurt you. That's obviously some damage that's going to happen to you. And those are words on my part. They haven't caused that injury to you. There's a difference. And when there's a difference, when there's not an exact match between state and federal law, there has to be that match. Otherwise, you haven't violated the federal statute. Otherwise, it's not an aggravated felony. But in Melchor Meceno, this court looked at a statute that was very similar to this and found that there was a categorical match. So how do we distinguish those cases for that case in particular? Well, in this particular case, I need you to consider the words of that Oregon statute. And that is that the words are by themselves are enough. So look at the words of the Oregon statute. The words by themselves are enough to cause this apprehension, this fear, this violation of the statute. If you look at the federal law, wouldn't wouldn't. So in the Oregon statute says an imminent serious there's a threat of imminent serious physical injury. Yes. Like the train speeding at the person. Yes. The federal statute says threatened use of physical force. I'm going to hurt you. But I don't understand. I mean, you say words are enough under the Oregon statute. But words would be enough theoretically. I mean, under the federal statute, too. If you threaten the use of physical force, you could threaten with words. And that would be enough under the federal statute. But it has to be from me personally, that threat, Your Honor. Under the Oregon statute, if I simply say there's something that's going to hurt you like the train coming at you. That is going to be enough to violate the Oregon statute. But it's not under the federal law because it's not me doing the force that's going to hurt you. Can I ask you a question on a different front? I'd like to have you focus just a little bit on Mr. Gahanna's claim for cat deferral relief. Yes. I think it's pretty well disputed that he had established. Past persecution. But the question is whether or not there's a threat or likelihood of future torture. And so can you kind of just walk me through the record, Evans, related to the likelihood of future torture? Thank you very much. You know, the BIA, the Board of Immigration Appeals, simply summarily rejected those claims on Mr. Gahanna's part. But if you look through the record, for example, on page, even in the government's brief, most recent brief on page eight, he submitted the 2015 State Department report. And according to the government, additional background on Ethiopia, showing how dangerous it was in general and to him in particular. Well, to him in particular, that's what I'm trying to find, because it has to be, you know, somewhat individualized. And I know there's references to the Oromo ethnic group, which apparently, you know, your client is part of. But I'm trying to figure out, is there anything other than that broad statement regarding the Oromo ethnic group that would, you know, be sufficient enough for us to think that he would face the likelihood of torture upon return and that relocation into another area is not possible? As regards to specific testimony, his brother was killed by government forces who were trying to get some information about him. He testified to that, and his testimony was found to be credible. And some of those citations are on 1482, 1483, a certified administrative record. As regards to his possibility to return, the case law that I cited seems to indicate, does indicate, that once you've established past persecution in a particular country, the burden of proof shifts to the government to show that the whole country is safe, that there is a place that you could relocate to. And you don't think the government shown that there's a place that they could relocate to here? I don't think they even tried. No, Your Honor. I didn't see that at all on the record. No. Well, but I mean, there's, it seems almost intuitive. If, if, if there was only the place where he came from, I mean, he could go back to another area of Ethiopia and nobody in the government would even be thinking about him, presumably. All the documents we see. How long had he been gone? He'd been gone, he'd been out of Ethiopia for quite a while, several years, right? Quite a few years. He was admitted here as a lawful permanent resident based on this asylum claim, his persecution claim, his torture claim in 1999. So that's 21 years. Yes. But things continue to happen, as happened to his brother. He continues to have contact there with Ethiopia. And so these documents continue to be generated or currently in the press almost every day about the bad situation in Ethiopia, everywhere in the country. Even the prime minister is a Romo and he's being attacked. You may want to reserve some time for rebuttal, but I wanted to ask you quickly about the due process claims, because to me, that seemed to be one of the stronger arguments you had. As I understand it, there's some evidence, and you've maybe alluded to some of that here about harm that his family faced. That would not, as I understand it, none of that was presented to the BIA. Is that correct? Not even mentioned by the BIA, not given a chance for a hearing. In fact, if you look at the administrative record, he was told at the last hearing, oh, you have an American relative. We'll continue that. And then it was just, OK, you haven't presented enough evidence, so we're going to fight against you. He never had a hearing on that at all, Your Honor. What evidence would he present, do you know? I know it doesn't technically matter for us, but I'm interested in what evidence he would present and whether it was potentially relevant to his claim. He would present the evidence that he has children here in the United States. He has a decent work history. This is the only offense he's ever committed. I mean, there are multiple numbers, but all on the same date, Your Honor, in 21 years. Just one offense. So he's going to go back and show his work records, going to go back and show his family ties, going to go back and be able to have a job then so he can support their family again, as he used to do. So there's a lot of things that personal testimony, I believe on their part, would be able to help the court decide in his favor. Counsel, I have one final question about the Ramos issue. Are you familiar with the Court of Appeals, Oregon Court of Appeals decision? It's found at 2013 Westlaw 993356. Are you familiar with that criminal appeal from Mr. Gajano? Yes, I am. It seems to say on page 22 that the trial court accepted the jury's unanimous verdicts on all counts of conviction. Why doesn't that foreclose your Ramos argument? I would argue that those are words that were perhaps inadvertently misused by counsel. The Supreme Court alluded to those sort of things in the Ramos decision, where they said that's the decision of the Court of Appeals. I understand that, yeah. And so it was a unanimous decision, like Alice in Wonderland. This is a unanimous decision, at least it was for the Oregon court and the Louisiana courts. I got 10. That's the equivalent of being unanimous in those courts. So, yeah, it's a unanimous verdict. But that's not the way the Supreme Court said it. So that's not the way the Sixth Amendment of the Constitution sees it, thank heavens. And so now he's entitled to have these proceedings dismissed. All right. Thank you, counsel. Thank you. We'll hear from the government. I was trying to start my video, Your Honors. There we go. Good morning, Mr. Ramos. I plead the court, Your Honors, Tim Ramos on behalf of the United States Attorney General. This immigration case, Mr. Gajano, challenges the agency's decision that he's removable as an alien convicted of an aggravated felony crime of violence. The alternative denied his application for relief and protection. The record and this court's precedent supports these claims. Starting with his removability as an alien convicted of a crime of violence, as the panel noted, Mr. Gajano meaningfully distinguished his case from Mel Corvacino. Mel Corvacino addressed a Colorado statute with almost identical wording, which found that wording prescribed a categorical crime of violence. Rather, what he points to is his argument that words cannot be a crime of violence. That is, constituted by the plain language of the definition of crime of violence under 16A, which includes threats of physical force. And this court's many decisions finding similar menacing and soft statutes still constitute crimes of violence. Addressing Ramos versus Louisiana, as Governor pointed out in the supplemental brief, and as the panel noted at the end of Petitioner's argument, he had a unanimous conviction in this case. And I can also attach to this fact because I'm representing the government in Mr. Gajano's habeas proceedings before the District Court in the Western District of Washington, where he also has admitted he had a unanimous jury conviction. All Petitioner can point to, meanwhile, is jury instructions that appear in the record. But meanwhile, Ramos is simply not in the record. Yes. Counselor, can I ask you, you say unanimous. In your view, does that mean 12? The appellant here is arguing that unanimous has a broader definition, and it could mean 10, 11, or 12. When you're using unanimous, you're asserting that it was 12, 12 to 0. OK. But that's really the part to put forward the horse, because as the panel also pointed out, this is immigration proceedings. It's a different posture. For immigration proceedings, a conviction is filed because there's a formal judgment of guilt on the definition of conviction in the INA. That is, until post-conviction relief has been granted, Petitioner has not pointed to any evidence, any filing he's made seeking post-conviction relief based on Ramos. And again, there's no evidence that he had a less than unanimous verdict. When the Oregon Supreme Court has addressed Ramos so far, this is also in the government supplemental brief, it noted that, well, it's only addressed on direct appeal. And on direct appeal, it noted to have it be plain on the face of the record that there was a less than unanimous verdict. That is, a jury poll had to have been taken. No evidence of that in this case. And moreover, Ramos versus Louisiana's majority opinion made it very clear that or strongly suggest that its opinion is not going to apply to grant people collateral relief. It's because the Oregon and Louisiana governments made arguments that if they were to abrogate their laws allowing for less than unanimous verdicts, there's going to be a cavalcade of people seeking post-conviction relief. And they said, the majority opinion said, on the contrary, states have an interest in finality as well. And this opinion is very unlikely to apply to people seeking post-conviction relief. Transition application. Yes, Your Honor. If you wanted to finish your argument on that point, that's fine. I wanted to switch gears a little bit and focus on the deferral of cap relief for cap relief. Can you talk to me about who has the burden here and why, when we know that it's undisputed that he had suffered persecution in the past, why he has, why there's not a fear of future torture for this Mr. This application for cap deferral is unlike an application for assignment withholding removal in that there is no rebuttable presumption of torture that arises from past torture. Instead, past torture is one of the factors that adjudicator considers when determining the probability of torture in the future. So he bears the burden to show he has established a clear probability of torture by with the acquiescence of Ethiopian government. And the agency accepted as true past torture had occurred in 1989. What the agency found, though, was that you fast forward 30 years later and nothing shows an individualized risk of torture for him now. Well, there is, if I could ask you, because in the country report, apparently, and the petitioner cites is that the current Oromos ethnic group is in Ethiopia, but where the killing continues. You know, to their opposition, you know, because of their opposition to the government's treatments are based on opposition to the government's treatment of their ethnic group. So isn't this sufficient or why isn't that sufficient to give Mr. Gatto Ortiz, which is frequently cited by the government, is insufficient to establish a particular risk of harm? And this claim essentially boils down to any one of Oromo ethnicity has a clear probability of torture in Ethiopia. And that's simply not true. The record shows generalized political violence, but nothing that shows that ethnic Oromos are targeted throughout Ethiopia, especially more likely they're not targeted for torture. There's political unrest. And he referenced evidence submitted with his most current motion reopen, which shows, in fact, far from every Oromo being targeted by the government, the prime minister is now an ethnic Oromo. And evidence also showed that, unfortunately, it was not groups. Groups of Oromo had been targeting people for harm in his most recent evidence, not government targeting Oromo individuals. His most recent evidence showed a group of Oromo people in the capital of Azobaba who allegedly murdered 56 individuals as part of another political protest. Let me ask you the waiver of admissibility, because it appears that Mr. Gatto may have a viable due process argument, especially in Zalupkin and Colomar. Can you please address that? Yes, Your Honor. The judge now argues that he should have, once he made a claim for justice and extreme hardship, that the board essentially should have automatically remanded his case for consideration of his hardship claim. But the board does not commit any error by assessing whether or not this is a viable claim before it is automatically remanded. If it did, then it would just be automatically remanding for anyone who submits an application for relief. Well, I'm sorry to interrupt, but it denied him the opportunity to present testimony related to the hardships that his family would suffer if he were to be removed. And I'm just trying to figure out, it seems like our case law is pretty clear. It doesn't matter whether his case might be weak, and he doesn't need to exactly proffer what evidence he would have to present based on our case law. So I'm just trying to figure out, on the record here, it looks like they just looked at the record and they didn't file the testimony. I don't know how we sidestepped those cases. Well, I think it's important to start with how he presented this case to the board. He, as Citrus Council noted, was requesting a continuance for an I-130 visa petition to be adjudicated, because he claimed that once it was adjudicated, he was automatically eligible for adjustment status because he had extreme hardship for purposes of a 212H waiver of his criminal indemnizability. So he's arguing to the board his motion. He stated, the immigration judge erred by not denying me a continuance because I'm eligible for hardship. Look at the evidence of hardship. And the board is just doing exactly what he asked it to do. It looked at the evidence of hardship and said, well, we disagree with you. You never established hardship. And he did submit plenty of hardship evidence to the immigration judge. He briefed hardship. There's an index of his hardship evidence in the record. And the board looked at this evidence and simply said, we disagree with you. You didn't establish extreme hardship, so the immigration judge did not err in this regard. Is your position that he never asked to come in and testify about the hardship? Because there's two issues. One is there's the written record. The other is, should he be given the opportunity to come in? Did he never ask to come in and have a hearing on the hardship and present more evidence? Yes, the immigration judge. But the immigration judge stated there was no approved application at the time, so there was no reason to have that hearing. But meanwhile, Fishner submitted that evidence. The immigration judge never considered hardship. What he was asking the board to do was look at this evidence and agree with him and say, well, the immigration judge should have given me this hearing. And the board simply disagreed. And the board does that routinely when there's a motion to reopen. And that's an important difference, because that's the posture. He's looking to reopen and remand his proceedings. So it's been a final order of removal issue, and he wants to show that there's new evidence that warrants reopening. So the board is doing just that. It's saying, look at your evidence of hardship, and we just simply disagree, even assuming there's legal error in this decision. Well, but David, back up, because the board looked at new evidence. I mean, your argument now seems to be this wasn't presented to the IJ, so therefore the BIA couldn't have done anything. And yet the BIA, at least according to you, did do something. They actually looked at the written evidence and said this doesn't amount to hardship. So it seems a little internally inconsistent there. And I don't know why we don't just have this, I guess, remanded to the IJ to have a hearing. I mean, now that I'm understanding it better, it seems to make sense why the IJ didn't have the hearing in the first place. But after the – are you telling me that the – once an I – is it the I-130? Once it's granted, after the IJ proceeding, but while it's before the BIA, that it's never remanded because the posture's changed? I'd have to show that you're eligible, because that's one factor in adjustment status is an approved visa petition. In his case, he's talking about admissibility, and he admitted he was not admissible because of his criminal convictions. And to otherwise be eligible for adjustment status, he needed that 2-12H extreme hardship paper. So that's what he's arguing to the board, and it's very similar except it forms a relief that aliens file motions to reopen for, like cancellation of removal. They could say, I now have a very sick child. Look at this evidence, and please reopen my proceedings so I can pursue cancellation of removal. That's exactly what the board's doing here, but the evidence was for extreme hardship to his family, not exceptional, extremely huge hardship, cancellation of removal. And the evidence wasn't the record, because that's what he wanted the immigration judge to look at, and the board looked at that evidence. Also, there's a question that the panel asked Petitioner. What evidence does he believe is missing from the record? What would they have testified to that was different than what he presented in the documents? Because that's really, if you assume the board erred in making this determination, you still have to prove prejudice, which has to mean there's a plausible claim for relief. I agree with you, and I asked that question, but I think it's also, I mean, it's more out of my curiosity. I'm not sure that it matters. I'm not sure that we get into that and make a determination. You know, he doesn't have a duty to proffer that to us. I mean, it is an interesting question, whether there would be prejudice or not. I have some suspicion about that, but it seems to me that our case doesn't allow us to go down that road, that if he wasn't allowed to present it, that he should be given an opportunity to do so. But your arguments, you know, maybe you have more arguments than the ones you've just made. It's typically prejudice at this point, because he has argued hardship, and he told the panel he had hardship to his children. He submitted evidence of hardship to his children, and these claims of hardship are implausible. He claimed extreme hardship to his youngest minor child, Isaiah, and Isaiah was the subject of his criminal proceedings. His mother wrote a letter to the Immigration Court begging DHS to remove Mr. Kahano because he presented a danger to Isaiah, presented a danger to her. Are they divorced now, do you know? Yes, they are. And does he have any visitation rights at this point? He does not. There is evidence in the record that he has no visitation rights, and he pays no child support, and that is what his ex-wife requested, because she doesn't want anything to do with him. So far from his removal showing extreme hardship to this child, it shows, if anything, his removal would benefit this family. He also has two other children to claim hardship to, Giovanni and the other child, excuse me, from his second relationship. And it's also implausible, because the records show Giovanni is a very troubled individual, but the records also show that he stays at social services. He's never known his father. He has no relationship with his father. So to claim extreme hardship to his child is, again, implausible. Otherwise, he has three adult, independent children from his first relationship. One of them wrote a letter describing not hardship to himself or his others, but to these other individuals that I mentioned in these other relationships. And that's why his claim is simply implausible, even if you believe that the board erred by looking at his claim and saying, we just don't agree that you warrant a reopening to have testimonial evidence on this claim, because you've already submitted documentary evidence, and we don't think it meets that standard. And that's commonly what the board does in motions to reopen. You have to assess the reasonable likelihood. The only time I'm aware when there's no prejudice analysis is in effective assistance of counsel cases where prejudice is presumed. But this is not bad. He's planning a procedural due process violation. So he has some prejudice of some sort. His brief doesn't make that argument hardly at all. Unless the panel has any other questions, the government would rest. Thank you, counsel. Thank you, counsel. Appears not. Thank you. Rebuttal? Yes, thank you, Your Honor. First of all, I'd like to point out that Mr. Cajano, through immigration proceedings, appeared pro se. So to make these arguments that secondhand ex post authorities determined to be insufficient is disingenuous, because he did the best he could by himself. And that's all that's there in the record. He tried. The second thing I'd like to point out is that he was eligible for withholding under 8 CFR 208-16. Immigration authorities found that he was ineligible because he committed a particularly serious crime. But what they ignored was his ex-wife's testimony on his behalf in 1409 or 1414. They ignored the fact that he was credible. He explained how this entire situation happened. And then, just like our case here recently on January 23rd, Roberto Franco Reyes v. Barr, where the alien explained how this whole situation just happened, and he was found to be credible. And then the government counsel said, would you like to challenge this issue or support this issue of a particular serious crime? The immigration judge asked that of government counsel. And on page 951 of the record, he refused. So we're not going to go into that. So that was never supported at all. Therefore, he was eligible for withholding. And therefore, as the court has already indicated, he's eligible for due process. It would be nice if the case were remanded to the immigration judge to get an attorney there to represent him and present this evidence properly. All right, counsel. You've exceeded your time. Thank you. If there are no further questions. All right. Thank you. Thank you to both counsel. The case just argued is submitted for a decision by the court. The next case on calendar for argument is Wright v. State of Alaska.
judges: Rawlinson, Murguia, Nelson